BOLICK, J,,
dissenting.
¶ 43 As children, we learn that the rules of the playground dictate that if someone makes a promise, no matter how solemnly, it is unenforceable if the person making the promise had his fingers crossed behind his back. As we grow up, we learn instead that many promises are moral and legal obligations, with consequences properly attached *117 to breaking them. Still, some grown-ups prefer the playground rules.
¶44 The Court today invalidates a core and unambiguous provision of a contract freely negotiated for mutual benefit between sophisticated parties represented by competent counsel. After Dobson Bay reaped the full benefits of its bargain, it defaulted on its repayment obligation and looked to the courts to avoid significant agreed-upon consequences of that default. The majority determines that the liquidated damages provision agreed to by the parties is an unenforceable penalty, based on its thorough examination of the Restatement (Second) of Contracts. Because I believe that over the course of that journey the majority lost the forest for the trees, I respectfully dissent.
¶ 45 The relevant provision of the Restatement (Second) is consistent with A.R.S. § 47-2718, which provides that a contract term “fixing unreasonably large liquidated damages is void as a penalty,” As with all statutes, we must construe this provision, if at all possible, in a constitutional manner. State v. Thompson, 204 Ariz. 471, 474 ¶ 10, 65 P.3d 420, 423 (2003).
¶ 46 Freedom of contract allows individuals to order their affairs and exchange goods and services, without coercion, in accord with their personal values and priorities. The Arizona Constitution so venerates contractual freedom that it is enshrined in our Declaration of Rights. Article 2, section 25 commands, “No ... law impairing the obligation of a contract, shall ever be enacted.” That provision requires us to indulge every presumption in favor of upholding a contract negotiated as this one was, and to assign a substantial burden of demonstrating unen-forceability to the party challenging the terms to which it willingly and knowingly agreed. The majority purports to assign the burden of persuasion to Dobson Bay, see ¶ 17, but that “burden” is so insubstantial as to transform § 47-2718 into “a law impairing the obligation of a contract.”
¶47 “The law of liquidated damages is unique within the common law of contracts because it overtly affronts freedom of contract.” Larry A. Dimatteo, A Theory of Efficient Penalty: Eliminating the Law of Liquidated Damages, 38 Am. Bus. L.J, 633, 634 (2001). That is because it allows courts to displace the intent of the parties by determining that a provision amounts to a penalty. Such discretion should be exercised with great care, for as the majority aptly notes, liquidated damages provisions “serve important purposes,” such as providing certainty when actual damages would be difficult to calculate and avoiding the costs and delays of litigation. See ¶ 8.
¶48 Moreover, “a party concerned foremost with performance, especially a timely performance, may use such a clause in the hope that it will provide a further inducement for performance.” Dimatteo, 38 Am. Bus. L.J, at 634, Certainly that is the case with the contract here. Dobson Bay sought a considerable loan—$28.6 million—to purchase four commercial properties. Under the contract terms, it would make interest-only payments for a prescribed period, after which it would repay the entire principal in a “balloon” payment. The timely return of the principal is a critical, indeed defining, feature of the loan. The contract underscored that fact by requiring, in addition to other fees described by the majority, a 5% fee for late interest payments or principal repayment. Absent evidence to the contrary by the party properly bearing the burden of proof, we may presume that the substantial loan Dob-son Bay sought would not have been made absent this assurance.
¶ 49 The lender was not voracious. Before the balloon payment was originally due in 2009, the parties negotiated a three-year extension. As the new date approached, the parties negotiated over another extension but failed to reach agreement. Thereafter the note was sold to La Sonrisa which then commenced foreclosure proceedings.
¶ 50 The majority applies two factors in determining whether the liquidated damages provision is “reasonable”; the anticipated or actual loss caused by the breach, and the difficulty of proof of loss. See ¶ 12. Proving the provision is reasonable based on actual damages makes little sense in most instances, given that the point of a liquidated dam *118 ages provision is to avoid litigation that requires proving actual damages. Accordingly, the proper inquiry “is whether the stipulated amount was, when all of the facts are considered, reasonable at the time of the contract and not whether it was reasonable with the benefit of hindsight.” Rampello, 168 Ariz. at 300, 812 P.2d at 1118. At the same time, citing a comment to Restatement (Second) § 366, the majority notes that if the difficulty of forecasting actual damages is great, considerable latitude is appropriate in assigning liquidated damages. Although the difficulty of forecasting the amount of loss here was great, the majority extends no such latitude.
¶ 61 The majority concludes that the lender is compensated for losses owing to a dilatory final payment elsewhere in the contract; specifically, through collection costs and foreclosure expenses. See ¶25. Further, “[t]he loss of use of money would be compensated by continuing payments of regular interest plus default interest.” Id. Given that we have no idea the use to which the lender would have put the money had it been returned in a timely manner, that conclusion is conjecture, and illustrates precisely why liquidated damages provisions are preferable to protracted litigation and judicial second-guessing.
¶ 52 The main cost to the lender of failing to recover the loan corpus in a timely fashion, and the most difficult to calculate in advance, is opportunity cost. La Sonrisa produced a declaration from Mitchel Medigo-vich, who has extensive experience as an Arizona trustee and real estate broker and originator. He attests that when a borrower unilaterally extends the due date of a balloon payment, it imposes costs, including opportunity costs, upon the lender. He likens the situation to a car rental company with a fixed fleet of cars. If a renter unilaterally extends a rental even by one day, it diminishes fleet availability and the ability to provide new rentals, which has economic ripple effects throughout the enterprise.
¶ 53 Medigovich summarized the consequences of a late final payment and the purpose of a liquidated damages provision:
Many lenders including banks make projections for expected and scheduled repayment of loans with which the lender makes interest payments to depositors, new loan commitments to prospective borrowers, bond payments to investors or to replenish capital reserves. In any event, failure of the borrower to make any scheduled payment including a payment due upon maturity of the loan, particularly in the case of [a] large commercial loan such as in this case puts the lender at great risk of default of its own commitments.... Consequently, in most commercial transactions, the parties agree that if the Borrower fails to make a final payment of principal on the due date, (a unilateral extension), the economic impact to the Lender is incalculable and therefore a Late Fee is necessary as liquidated damages to the lender.
¶ 54 Such late fees are not a penalty because (1) “[a] lender with a non-performing loan has significantly increased risk of recovery,” (2), “in addition to the expense of managing the non-performing asset, the lender is denied the ability to reinvest expected ... payments into new performing investments at current market rates” (emphasis added), and (3) “the lender may be at risk of defaulting on other loan commitments wherein funding is contemplated by the loan maturing.” Whether any or all of those factors will occur in a particular loan context is unpredictable, and the cost of possible lost opportunities is inherently difficult to calculate.
¶55 Consequently, Medigovich observes, customary late fees for commercial transactions typically start at 4% or 5% and range up to 10%. In Medigovich’s view, the 5% fee here was “perhaps below what is reasonable for the circumstances,” which involved “a complex transaction with multiple properties as the collateral and multiple entities as the Borrower.”[1]
*119 ¶ 56 Thus, even though La Sonrisa did not bear the burden of proving that the liquidated damages provision was reasonable, it supplied powerful evidence that the economic damages flowing from default or delayed final payment were potentially substantial, difficult to forecast or calculate, and not fully encompassed by other fees in the contract.
¶ 57 In contrast, Dobson Bay, the party that purportedly bore the burden of proof, presented by way of contravening evidence: absolutely nothing.[2]
¶ 58 Unsurprisingly, the trial court, which weighed the evidence presented by La Sonri-sa and the absence thereof by Dobson Bay, concluded that the liquidated damages provision was enforceable. The court of appeals, by contrast, held that as a matter of law, “absent unusual circumstances,” a 5% liquidated damages provision in a contract like this is unenforceable. Dobson Bay, 239 Ariz. at 140 ¶ 22, 366 P.3d at 1030. The court cited neither law nor precedent for such a sweeping substantive pronouncement, although at least it provided a clear rule to which contracting parties could conform themselves.
¶59 The majority’s opinion here is more legally grounded but also far more nebulous. Is a default fee based on a percentage amount per se invalid because it does not vary with the duration of the default, even though amount-based late fees may not fully compensate for lost opportunity costs; or do the parties have to litigate every time to find out, which defeats the important purposes of liquidated damages clauses? Either way, the economic consequences may be severe. As La Sonrisa’s expert attested, again unrebutted by the party ostensibly bearing the burden of proof, percentage-based liquidated damages provisions for late balloon payments are common components of commercial loan contracts. Every single one is now in legal purgatory.
¶ 60 I prefer the approach taken by the New Jersey Supreme Court in MetLife, 732 A.2d at 499, which is more faithful to the Restatement and protective of freedom of contract. MetLife involved a contract containing percentage-based late and default fees as liquidated damages, in addition to collection and various other fees. Id. at 495-96. At trial, MetLife’s expert testified that a 5% late fee was the industry custom and standard, and was a reasonable forecast of costs including “lost investment opportunities.” Id. at 496. Unlike here, the party challenging the provision actually produced contrary evidence. Id. at 497. The trial court found both the late fee and a 12.55% default fee represented reasonable liquidated damages. Id. The court of appeals reversed for reasons similar to those in the majority opinion here. Id. at 497-98.
¶61 The Supreme Court reversed the court of appeals. It began by noting that a “need for close scrutiny arises from the possibility that stipulated damages clauses may constitute an oppressive penalty.” Id. at 498. But the court should assess such provisions on a “continuum; the more uncertain the damages caused by a breach, the more latitude courts give the parties on their estimate of damages.” Id. The court held that “liquidated damages provisions in a commercial contract between sophisticated parties are presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness.” Id. at 499.
¶ 62 Applying those standards, the court concluded that the 5% late fee was reasonable because (1) “[i]t seems evident that late payments on larger loans would present a greater risk to the lender” given that they constitute a larger portion of a lender’s portfolio, and (2) “damages resulting from the *120 loss of investment opportunity increases with the size of the late installment payment,” thus “a lender suffers both larger administrative and ‘opportunity cost’ damages when a borrower is late with a larger payment.” Id. at 500. Because operational “costs are spread over an entire loan portfolio, it is difficult to identify specific damages attributable to the late payment or default of one specific borrower.” Id.
¶ 63 Given the difficulty in forecasting damages from late payment or default, the court looked to what was permitted by statute “and what constitutes common practice in a competitive industry.” Id. The testimony that 5% was the industry standard was (as here) uncontradicted. Id. By contrast, cases in which fixed-percentage liquidated damages provisions were struck down “involved unusually large percentages or explicit evidence of a coercive intent.” Id. at 501-02 (citing cases).
¶ 64 The court also sustained the 12.55% default interest rate. “As with the costs of late payments, the actual losses resulting from a commercial loan default are difficult to ascertain.” Id. at 503. “The lender cannot predict the nature or duration of a possible default,” nor “is it possible when the loan is made to know what market conditions might be” at time of default or “what might be recovered from a sale of the collateral.” Id. “For example, a lender cannot know what its own borrowing costs will be if a borrower defaults ... nor accurately predict what economic return it will lose when the borrower fails to repay the loan on time.” Id. Because the 12.55% default interest rate “appears to be a reasonable estimate of potential damages, falls well within the range demonstrated to be customary, and because a stipulated damages clause negotiated between sophisticated commercial entities is presumptively reasonable,” the court sustained it, Id.
¶ 65 Our Court likewise should presume that a liquidated damages provision negotiated by sophisticated parties is valid and conclude that the party bearing the burden of demonstrating its unreasonableness failed to sustain that burden in this case. Instead, we reward the party breaching the contract by removing a critical term to which it assented and, as a necessary consequence adding both insult and injury, require the non-breaching party to pay its attorney fees. Our decision will inevitably have a corrosive effect on the making and enforcement of contracts in Arizona, with predictable and substantial adverse economic consequences, notwithstanding that freedom of contract is enshrined in our organic law. With great respect to my colleagues, I dissent.

. Here, the lender sold the note to La Sonrisa. Amicus Arizona Private Lender Association explains the circumstances that give rise to such a sale:
These lenders often have a significant portion of their total available funds invested at any given time.... Therefore, it is important to private lenders that their borrower repay on time to free up cash for new loans to keep the money moving and working for the business .... Thus when a borrower defaults on the repayment of the principal, the lender may be *119 forced to sell the note to a collection agency at a discount. Late fees and default interest make the defaulted notes more attractive to collection firms, resulting in higher purchase prices for the notes, which helps the lender to protect against losses and keep its capital in the market.

. "Under a traditional common law analysis, the burden of proof regarding the enforceability of a liquidated damages clause rests squarely on the party seeking to set it aside.” Dimatteo, 38 Am. Bus. L.J. at 664-65. "Although courts recognize this traditional allocation of burden of proof, in reality the onus seems to be upon the non-breaching party to prove reasonableness.... In fact, some courts remain largely influenced by any disproportion between the stipulated amount and actual damages.” Id. at 667-68. That is an accurate depiction of the majority analysis.